**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STACY LYNN HATFIELD,<br><br>        Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHIL1,<br>Commissioner of the Social<br>Security Administration,<br><br>        Defendant. | Case No. EDCV 17-0287 SS<br><br><br>**MEMORANDUM DECISION AND ORDER** |

**I.**

**INTRODUCTION**

Stacy Lynn Hatfield ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Alternatively, she asks for a remand.  On February 16, 2017, Plaintiff filed a complaint (the "Complaint") commencing the instant action.  On July 11, 2017, Defendant filed an Answer to the Complaint (the "Answer").  The

parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On January 16, 2013, Plaintiff filed an application for DIB under Title II. (Administrative Record ("AR") 144-51). Plaintiff's application alleges disability beginning on December 27, 2011 due to a left arm injury and residual pain, headaches, anxiety, depression, and suicidal thoughts. (AR 173). Plaintiff's DIB application was denied both initially on August 23, 2013 and upon reconsideration on January 6, 2014. (AR 92-95, 99-102).

On January 15, 2014, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (AR 103-04). The hearing took place in San Bernardino, California on February 3, 2015 with ALJ Nancy Stewart presiding. (AR 34-58). On April 24, 2015, ALJ Stewart issued an unfavorable decision, finding Plaintiff able to perform light work but with some additional limitations. (AR 12-33). On June 2, 2015, Plaintiff requested review of the ALJ's decision before the Appeals Council. (AR 11). On December 23, 2016, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (AR 1-7).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on April 7, 1962 and was 50 years old at the time she filed her application for DIB. (AR 59). On December 27, 2011, Plaintiff suffered a work injury. (AR 266). Plaintiff fell off a ladder from a height of approximately two ladder rungs and struck her left elbow. (AR 266). She went to the emergency room ("ER") and had surgery on her left elbow the following morning. (AR 259, 266).

**A.   Plaintiff's Medical History**

When applying for DIB, Plaintiff alleged suffering from "depression, headaches, suicidal, injured left arm, anxiety and constant pain from the arm injury." (AR 173).

1.   Physical Health History

a.   Left Elbow Condition

On December 28, 2011, Plaintiff had surgery on her left elbow. (AR 259). After falling at work, Plaintiff went to the hospital where she was diagnosed with "a displaced olecranon fracture and a nondisplaced distal humeral fracture. (AR 266, 267). Dr. Raja Dhalla performed surgery on Plaintiff's left elbow at Riverside Community Hospital. (AR 259). The procedure involved "open reduction internal fixation of left elbow olecranon process

fracture with Acumed plates and screws" with the "use of interpretation of fluoroscopy." (AR 259). At the end of the procedure, Dr. Dhalla found Plaintiff's left elbow had "good range of motion" and that there was "no block to the range of motion." (AR 260).

On April 3, 2012, Plaintiff underwent an MRI of her left shoulder at SimonMed. (AR 249). Dr. Jeffrey Dym reviewed the MRI and concluded that Plaintiff had "mild bursal sided fraying of the far anterior insertion of the supraspinatus tendon" and "associated tendinopathy" but no "full-thickness tear." (AR 249). He also found "mild proximal biceps tendinopathy," but no "effusion, fracture, or muscle atrophy." (AR 249). Additionally, he found "degenerative changes as described, mild impingement and mild subacromial/subdeltoid bursitis." (AR 249).

On June 18, 2012, Plaintiff underwent a series of x-rays of her left elbow. (AR 289). Dr. Raja Dhalla reviewed them and found the olecranon fracture had healed. (AR 289, 290). The elbow alignment was good with no apparent dislocation or sublaxation. (AR 289). The plates and screws that had been attached were also found to still be in place and were not bent, broken, or loose. (AR 289).

On July 24, 2012, Plaintiff had surgery on her left elbow and shoulder. (AR 251). Dr. Raja Dhalla also performed this outpatient surgery at Riverside Community Hospital. (AR 251). Plaintiff was diagnosed with "status post left elbow open reduction internal

fixation of olecranon with Acumed plate and screws" and "frozen shoulder syndrome." (AR 251). The surgery involved the removal of the Acumed plate and screws from the left elbow, arthroscopic synovectomy of the left shoulder, "debridement of posterior superior labrum with arthroscopic capsule release and bursectomy with subacromial decompression." (AR 251). Plaintiff's elbow and shoulder were also manipulated during the surgery. (AR 251). During the procedure, the surgeon saw the rotator cuff tendon and there was no rotator cuff tear. (AR 252).

On November 18, 2013, Plaintiff had a follow-up appointment with Dr. Dhalla for her left shoulder. (AR 635). Dr. Dhalla found Plaintiff had 170 degrees of elevation with her left shoulder and did not have pain or weakness during rotator cuff testing. (AR 363). Dr. Dhalla also reported Plaintiff "has completed treatment and has done very well." (AR 636). Part of that treatment included physical therapy which Plaintiff also completed. (AR 292-338).

On February 27, 2014, Dr. Christopher Fleming completed an examination of Plaintiff in connection with her workers' compensation calim. (AR 648). This examination included physically examining Plaintiff and reviewing her records. (AR 669). Dr. Fleming opined that Plaintiff's right shoulder pain was connected to her left elbow injury because she was compensating with her right arm. (AR 669). He explained that it was "not unreasonable" for her to develop pain in her right shoulder despite being right-handed. (AR 668-69). Because she experienced pain in not just her left shoulder but also her left elbow after her work

injury, she would have used her right arm for everything which could have resulted in injury to her right shoulder. (AR 668-69). Dr. Fleming listed work restrictions for Plaintiff:

> For the shoulders, the patient has precluded from repetitive use of the upper extremities at or above shoulder level. For left upper extremity, she has precluded from repetitive heavy lifting, pushing, pulling, gripping, grasping, or other repetitive tasks more than 10 pounds. (AR 666).

Dr. Fleming recommended an MRI scan for the right shoulder to determine if further treatment was required. (AR 666). He stated Plaintiff should continue to exercise her left shoulder at home. (AR 666).

Plaintiff's medical records also indicate a history of treatments prior to her alleged onset date of disability. Plaintiff had a past cervical spine fusion of the C6 and C7 vertebrae. (AR 283). She also had a previous left shoulder rotator cuff repair. (AR 283). Previous right shoulder and arm fractures are also listed. (AR 283).

b. Heart Condition

On December 29, 2012, Plaintiff had an echocardiogram ("ECG") performed at Riverside Community Hospital. (AR 258). When Plaintiff went to the ER after her work injury, the ER doctor noted a history of cardiac arrhythmia which required Plaintiff to receive medical clearance for surgery by an internal medicine specialist.

(AR 266-67). The internal medicine specialist cleared her for surgery but requested an ECG and recommended Plaintiff receive further evaluation. (AR 269). The ECG was reviewed by Dr. Sivanandan Vasudevan who found that Plaintiff's cardiac valves were normal. In addition, Plaintiff had normal intracardiac dimensions, her left ventrical wall motion was normal, her Doppler study was within normal limits, there was no pericardial effusion and her RV function was normal. (AR 258).

On September 11, 2013, Plaintiff saw Dr. Andrew Ho at Riverside Cardiology Associates. (AR 678). Plaintiff reported experiencing heart palpitations. (AR 678). Dr. Ho indicated Plaintiff has paroxysmal atrial tachycardia and mitral valve regurgitation. (AR 679). Dr. Ho listed Plaintiff's mitral valve regurgitation as remaining "overall stable" and noted she had an ablation scheduled for the tachycardia. (AR 678).

On October 28, 2013, Plaintiff had an ablation procedure for supraventricular tachycardia. (AR 694). Dr. Vilma Torres performed the procedure. (AR 694). At her follow-up visit on November 6, 2013, Plaintiff said she had not had a rapid heartbeat after the ablation "but it feels different." (AR 694). Dr. Torres requested a stress test and informed Plaintiff she may need to have another ablation or she may need a permanent pacemaker. (AR 694).

On November 6, 2013, Plaintiff underwent a treadmill test at Loma Linda University Health System at the request of Dr. Vilma Torres. (AR 687). Plaintiff's diagnosis was cardiac arrhythmias,

unspecified. (AR 687). During the stress test, Plaintiff's resting ECG revealed normal sinus rhythm and first degree AV block. (AR 687). With her arrhythmias, she also showed occasional premature ventricular contractions. (AR 687). Her stress ECG response was negative for ischemia. (AR 687).

2. <u>Mental Health History</u>

On April 15, 2013, Riverside Center for Behavioral Medicine admitted Plaintiff, with several diagnoses including alcohol dependence, sedative hypnotic dependence, opioid abuse, bipolar disorder, depressed versus mood disorder secondary to alcohol dependence. (AR 413, 452). The Riverside Center discharged her on April 17, 2013. (AR 413). Dr. Mekund Deshmukh treated her. (AR 452). She received treatment for alcohol detoxification. (AR 413-14). When she was admitted, she received a GAF score of 25. (AR 414). Her GAF score improved to 40 by the time she was discharged. (AR 413). She claimed she was depressed but denied being suicidal. (AR 414). Her depression appeared to be affected by the death of her mother in September 2012. (AR 418).

On April 24, 2013, Plaintiff was admitted to a partial hospitalization program at Riverside Center for Behavioral Medicine with the same doctor to receive supportive care. (AR 462).

On February 12, 2014, Plaintiff started receiving treatment from Riverside Psychiatric Medical Group. (AR 646). She was treated by Nurse Practitioner ("NP") Kathleen Comer. (AR 646-47).

NP Comer listed alcohol dependence, anxiety - unspecified, bipolar disorder – mixed unspecified, and adjustment disorder as problems experienced by Plaintiff. (AR 646). NP Comer also noted that Plaintiff had not followed her medication regimen. (AR 646).

Plaintiff's next visit with NP Comer was not until June 5, 2014. (AR 645). At that time, NP Comer noted Plaintiff had stopped taking her medications for roughly three months. (AR 645). NP Comer found Plaintiff had no orientation, cognitive, or memory impairments. (AR 645).

On July 22, 2014, Dr. Robin Campbell performed a complete psychological evaluation of Plaintiff. (AR 552). Plaintiff drove herself to the appointment. (AR 552). She arrived on time. (AR 552). She was wearing a left arm brace but did not appear to have any trouble walking or standing. (AR 552). She was neatly groomed. (AR 552). Dr. Campbell reviewed Plaintiff's records from Riverside Center for Behavioral Medicine but did not have access to any other records. (AR 553). Plaintiff reported the ability to "do household chores, run errands, shop, cook, dress and bathe herself." (AR 554). Plaintiff manages her own finances. (AR 554). Plaintiff reported that she likes to watch television and play games. (AR 554). She does not need physical assistance to get around. (AR 554). She also "gets along fairly well with those people she comes into contact with on a daily basis." (AR 554). Plaintiff also established "a rapport" with Dr. Campbell. (AR 554). Plaintiff reported two prior arrests for DUI as well as methamphetamine and cocaine use in the past. (AR 554).

Dr. Campbell ultimately found Plaintiff capable of "understanding, remembering, and carrying out" both simple and detailed instructions. (AR 557). According to Dr. Campbell, Plaintiff can "make judgments on simple, work-related decisions." (AR 557). Plaintiff would have "moderate difficulty" interacting with the public and people at work. (AR 557). She would also be "moderately impaired" in dealing with work-related changes and stressors. (AR 557). Dr. Campbell also believed Plaintiff is capable of managing her finances. (AR 557).

**B.** **Treating Physician Opinion**

On March 21, 2014, Plaintiff's treating physician, Dr. Allen Felix, filled out a medical opinion form related to Plaintiff's ability to do work-related tasks. (AR 675). He stated Plaintiff can lift and carry less than ten pounds on an occasional basis, meaning no more than one third of an eight-hour day. (AR 675). He indicated Plaintiff can only stand and walk for about three hours and only sit for about two hours during an eight-hour day with normal breaks. (AR 675). This was further qualified that Plaintiff can only stand for ten minutes and sit for thirty minutes before needing to alter position. (AR 675). He stated Plaintiff needs to walk around every twenty minutes for five minutes and that she needs to be able to alternate freely between sitting and standing. (AR 676). Dr. Felix also indicated Plaintiff would need to lie down once per day during working hours. (AR 676). Plaintiff can only occasionally twist, stoop, crouch and climb stairs and

can never climb ladders. (AR 676). Plaintiff's ability to reach, handle, finger, feel, and push/pull are impaired. (AR 676). She needs to avoid concentrated exposure to extreme heat, wetness, humidity and noise. (AR 677). Fumes, odors, dusts, gases, poor ventilation, etc., she needs to avoid even moderate exposure. (AR 677). Finally, according to Dr. Felix, Plaintiff needs to avoid all exposure to extreme cold and hazards such as machinery and heights. (AR 677).

Dr. Felix found all of these restrictions were based on Plaintiff's degenerative joint disease in both knees, cervical fusion, chronic low back pain and limited use of left arm because of the elbow fracture and rotator cuff tendonitis. (AR 676). Additionally, Dr. Felix listed Plaintiff has trouble with dizziness and balancing and that she has auditory hallucinations. (AR 677).

**C.   State Agency Doctors**

Two Physical and Mental Residual Functional Capacity Assessments ("Residual Assessment") of the Plaintiff were conducted. (AR 59-72, 74-90).

**1.   Initial Level Residual Assessment**

Dr. Paxton completed the Residual Assessment of the Plaintiff at the initial level on August 23, 2013. (AR 59-72). For the physical limitations assessment, concerning the Plaintiff's exertional limitations, Dr. Paxton found the Plaintiff can

occasionally lift twenty pounds and can frequently lift ten pounds. (AR 67). Dr. Paxton also found the Plaintiff can stand and/or walk about six hours in an eight-hour work day and can sit for about six hours in an eight-hour workday. (AR 67). Dr. Paxton found the Plaintiff could push and/or pull (including operation of hand and foot controls) subject to the lifting limitations. (AR 67). Plaintiff's postural limitations were such that she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (AR 67). However, Dr. Paxton found the Plaintiff can never climb ladders, ropes, or scaffolds. (AR 67). For manipulative limitations, Dr. Paxton found that Plaintiff's left overhead reach was limited but her gross manipulation, fine manipulation, and skin receptors were not limited. (AR 68). Regarding environmental limitations, Dr. Paxton found Plaintiff should avoid concentrated exposure to vibration and hazards such as heights and machinery. (AR 68). Dr. Paxton did not find any visual or communicative limitations. (AR 68).

Dr. Paxton also assessed Plaintiff's mental limitations. Dr. Paxton found Plaintiff's concentration and persistence limitations are not significantly limited except she is moderately limited in carrying out detailed instructions. (AR 69). In relation to social interaction limitations, Plaintiff was found to be moderately limited in her ability to appropriately interact with the public. (AR 70). Dr. Paxton did not find Plaintiff to have any understanding and memory limitations or adaptation limitations. (AR 69, 70). Overall, Dr. Paxton found Plaintiff was not disabled but was limited to unskilled, light work. (AR 71).

## 2. Reconsideration Level Residual Assessment

Dr. DeBorja completed the Residual Assessment of Plaintiff at the reconsideration level on January 2, 2014. (AR 74-90). Starting with the physical limitations assessment, Dr. DeBorja found Plaintiff had the same exertional limitations as the initial level Residual Assessment except she was also limited in her left upper extremity when pushing and pulling. (AR 84). For Plaintiff's postural limitations, Dr. DeBorja found the same limitations except that Plaintiff could frequently stoop, kneel, and crouch. (AR 84). Dr. DeBorja found the same manipulative limitations but specified that left overhead reaching was limited to occasionally. (AR 85). The environmental limitations were found to be the same with the added statement that "moderate exposure to machineries that require more than occasional postural activity to operate" should be avoided. (AR 86).

Dr. DeBorja also addressed some of Plaintiff's allegations regarding her physical limitations, finding them only partially credible. (AR 86). Dr. DeBorja stated because there is no problem with Plaintiff's right shoulder or elbow, the pain in her left shoulder and elbow should not prevent her from being able to lift more than 6 pounds. (AR 86). Dr. DeBorja found no reason for Plaintiff to be experiencing any problems with ambulation such that she would need to rest before walking a quarter of a mile. (AR 86). The doctor also noted that the medical evidence did not show that Plaintiff suffered from headaches. (AR 86).

The mental limitations of Plaintiff were assessed during the reconsideration level Residual Assessment, however they were performed by a psychological consultant, Dr. Waranch. (AR 81, 88). Dr. Waranch found Plaintiff's concentration and persistence limitations to be the same with one addition. (AR 87). Dr. Waranch found that Plaintiff was moderately limited in her ability to both finish a normal work schedule without symptoms rooted in psychological impairments interrupting and to maintain a consistent work pace without unreasonable rest periods. (AR 87). However, Dr. Waranch explained that Plaintiff would be "capable of maintaining attendance and completing a workweek" but that she would have difficulty "carrying out detailed tasks and maintaining attention and concentration for such tasks on a regular basis." (AR 87). Additionally, Dr. Waranch stated that Plaintiff is capable of completing "simple, 2-3 step instructions and maintaining attention and concentration when doing so." (AR 87). Dr. Waranch found Plaintiff's social interaction limitations included moderate limitations to her ability to take directions and correction from supervisors and to get along with coworkers without distracting them or displaying extreme behaviors. (AR 87). Dr. Waranch explained that Plaintiff can interact with the public and get along with both supervisors and coworkers but only if the contacts are short and intermittent. (AR 87). For adaptation limitations, Dr. Waranch found that Plaintiff was moderately limited in both her ability to handle changes in the work environment and travel in new places or use public transportation. (AR 88). Dr. Waranch explained Plaintiff can adapt to changes and pressures in the work setting if they are not constant. (AR 88).

Dr. Waranch did not find any understanding and memory limitations. (AR 86).

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998)(citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)(citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

(2)  Is the claimant's impairment severe?  If not, the claimant
     is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of a list
     of specific impairments described in 20 C.F.R. Part 404,
     Subpart P, Appendix 1?  If so, the claimant is found
     disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If
     so, the claimant is found not disabled.  If not, proceed to
     step five.

(5)  Is the claimant able to do any other work?  If not, the
     claimant is found disabled.  If so, the claimant is found
     not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
262 F.3d 949, 953-54 (9th Cir. 2001)(citing Tackett); 20 C.F.R. §§
404.1520(b) – 404.1520(f)(1) & 416.920(b) – 416.920(f)(1).

     The claimant has the burden of proof at steps one through
four, and the Commissioner has the burden of proof at step five.
Bustamante, 262 F.3d at 953-54 (citing Tackett).  Additionally,
the ALJ has an affirmative duty to assist the claimant in developing
the record at every step of the inquiry.  Id. at 954.  If, at step
four, the claimant meets his burden of establishing an inability
to perform past work, the Commissioner must show that the claimant
can perform some other work that exists in "significant numbers"
in the national economy, taking into account the claimant's

residual functional capacity,[2] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001)(citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000)(citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

---

[2] Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

1

**V.**

2

**THE ALJ'S DECISION**

3

4      The ALJ used the above five-step process and found Plaintiff

5    was not disabled according to the Social Security Act.  (AR 15-

6    28).  Initially, the ALJ found Plaintiff was insured as required

7    by the Social Security Act through December 31, 2016.  (AR 17).

8    At step one, the ALJ found Plaintiff had not engaged in

9    substantial gainful activity from the alleged disability onset

10   date.  (AR 17).  At step two, the ALJ found Plaintiff had

11   multiple severe impairments:

12

13              "degenerative joint disease of the bilateral
                knees; cervical fusion with chronic low back
14              pain; disorder of the left elbow secondary to
                fracture; left shoulder rotator cuff tear; cardio
15              disorder, history of tachycardia, status post
                ablation of supraventricular tachycardia; bipolar
16              disorder; and a history of alcohol abuse."  (AR
                17).
17

18   The ALJ considered all of Plaintiff's found impairments for the

19   remaining steps of the evaluation process.  (AR 17-28).  At step

20   three, the ALJ found Plaintiff's impairments did not meet or

21   medically equal in whole or in part any of the specific impairments

22   as required under this step of the process.  (AR 17).  Next, the

23   ALJ determined Plaintiff's residual functional capacity for use in

24   steps four and five.  (AR 20).  The ALJ found Plaintiff's residual

25   functional capacity allows her to perform light work with certain

26   exceptions:

27

28

> "occasional pushing and pulling with the upper
> left extremity and bilateral lower extremities;
> no operation of foot pedals; standing and/or
> walking for 6 hours in an 8-hour day, with no
> prolonged walking greater than an hour at a time;
> sitting for 6 hours in an 8-hour day, with the
> ability to stand and stretch as needed, but not
> to exceed 10% of the day; no climbing ladders,
> ropes, or scaffolds; no kneeling or crawling;
> frequent use of left upper non dominant extremity
> for fine and gross manipulation; no limits to the
> right extremity; no exposure to work hazards,
> such as working at unprotected heights or
> operating fast or dangerous machinery; noncomplex
> routine tasks; and the claimant can perform jobs
> that do not require hypervigilance."  (AR 20).

In reaching this residual functional capacity, the ALJ gave no weight to the opinion of Plaintiff's treating doctor, Dr. Felix. (AR 22).  Based on this residual functional capacity, at step four the ALJ found Plaintiff is unable to perform her previous work. (AR 26).  Finally, at step five the ALJ found there are other jobs in the national economy in significant numbers that Plaintiff could perform.  (AR 27).  Thus, the ALJ found Plaintiff was not disabled under the Social Security Act from the alleged onset date through the date of the decision.  (AR 28).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on

legal error or are not supported by substantial evidence in the record as a whole. Garrison v. Colvin, 759 F.3d 995 (9th Cir. 2014)(citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006); Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001)(citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)(citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Auckland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff contends the ALJ failed to properly consider and weigh her treating physician's medical opinion regarding her

physical conditions and limitations.[3]  First, Plaintiff argues the ALJ did not give sufficiently specific and legitimate reasons that were supported by substantial evidence in her decision to give no weight to Dr. Felix's opinion.  Second, Plaintiff claims the ALJ erred in failing to request clarification from Dr. Felix regarding his opinion because there are no records from him in Plaintiff's record other than his Medical Opinion form.

### The ALJ Provided Specific And Legitimate Reasons To Reject Plaintiff's Treating Doctor's Opinion

Although a treating physician's opinion is usually entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  When the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may properly reject the treating doctor's opinion by providing "specific and legitimate reasons supported by substantial evidence in the record for so doing." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Similarly, if an examining doctor's opinion is contradicted by another doctor, it too can only be rejected based on the specific and legitimate reasons standard.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir.

---

[3] While Plaintiff was also diagnosed with mental impairments. In a communication to the Appeals Council, Plaintiff argued that her mental impairments should have been the focus of the ALJ's decision.  However, she failed to raise this issue in her brief before this Court.  Accordingly, it is waived.  Even if Plaintiff had raised it, the Court finds that the ALJ appropriately considered the evidence regarding mental impairments.

1995).  This standard can be met by the ALJ detailing all of the facts and conflicting medical evidence and stating her conclusions. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).

"Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  If there are conflicts between the medical opinions, the ALJ decides how to resolve them based on how credible they are.  Tommasetti v. Astrue, 533 F.3d 1035, 1041-42 (9th Cir. 2008)(citing Andrews, 53 F.3d at 1039-40); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Here, the ALJ noted conflicts between Plaintiff's treating physician's medical opinion and the state agency doctors' medical opinions and found that the treating doctor's opinion was too limiting.  (AR 22-23).  The ALJ found the treating doctor's medical opinion was not consistent with Plaintiff's medical records and reported daily activities.  (AR 22).  In contrast, the ALJ found the state agency doctors' opinions were "generally consistent with the medical record as a whole and with the claimant's reported activities of daily living."  (AR 22).  Because conflicts were noted between different doctors' opinions, the ALJ needed to

provide specific and legitimate reasons supported by substantial evidence in the record to reject Plaintiff's treating physician's opinion.  Lester, 81 F.3d at 830.

Dr. Felix gave more severe restrictions than did the State agency doctors regarding Plaintiff's limitations in using her upper extremities.  In evaluating the state agency doctors' opinions, the ALJ noted the medical evidence of Plaintiff's surgeon, Dr. Dhalla, which stated Plaintiff had healed well following her left shoulder and elbow treatment, supported the state agency doctors' view of Plaintiff's abilities.  (AR 22).  Specifically, Plaintiff had 170 degrees of elevation in her left shoulder and had no pain or weakness during her left rotator cuff test.  (AR 22).  This is an independent clinical finding by a treating physician, her surgeon, and is itself substantial evidence for the ALJ's decision. The ALJ also noted that x-rays of Plaintiff's shoulders taken in 2014 showed no significant findings.  This objective evidence also undermined Plaintiff's allegations of disabling pain.  (AR 22). The surgeon's report as well as the x-rays provide specific and legitimate reasons to reject Dr. Felix's opinion that Plaintiff is severely limited in her use of her upper extremities.  (AR 23).

The ALJ next addressed Plaintiff's knee and back pain.  The ALJ noted that Plaintiff was diagnosed with bilateral degenerative joint disease of the knees and chronic low back pain resulting from a previous cervical spine fusion.  (AR 22).  However, the ALJ also noted Plaintiff was not receiving treatment for these symptoms.

Instead, these conditions were only being "monitored". (AR 22). This lack of treatment conflicts with Dr. Felix's opinion that Plaintiff can only stand or walk for three hours in an eight-hour day and only stand for 10 minutes at a time. (AR 23). It also conflicts with Dr. Felix's opinion that Plaintiff can only sit for two hours in an eight-hour day and only for thirty minutes at a time. (AR 23). As such, it also serves as a specific and legitimate reason to reject Dr. Felix's opinion.

The ALJ also considered Plaintiff's heart condition. The ALJ observed Plaintiff was diagnosed with atrial tachycardia and had an ablation performed in November 2013. (AR 22). However, the ALJ again noted that Plaintiff received no further documented treatment for this condition. (AR 22). Additionally, the ALJ mentioned Plaintiff's cardiac testing returned normal results. (AR 22). Accordingly, the ALJ provided specific and legitimate reasons for rejecting limitations based upon Plaintiff's heart condition.

The ALJ also properly relied upon Plaintiff's self-reported daily activities as a reason to reject the degree of limitation set forth by Dr. Felix. The ALJ found Plaintiff's daily activities included doing household chores, running errands, shopping, cooking, playing games, watching TV, and going to her appointments. (AR 23). All of these activities indicate Plaintiff is independent, able to take care of herself and not as physically limited as Dr. Felix claims. Plaintiff argues that she does not have to cease all daily activities before she can be found to be disabled. She is correct. However, the ALJ did not look at

Plaintiff's daily activities in isolation.  Rather, she considered them along with the medical evidence and found that Dr. Felix's opinion regarding Plaintiff's limitations was further undermined by Plaintiff's daily activities.

The ALJ also considered the opinions of the State agency medical consultants.  She found them to be supported by the medical record and so gave them the most weight.  (AR 22).  These doctors reviewed Plaintiff's medical record and reached medical opinions regarding her limitations that the ALJ found was consistent with the medical record.  Because the State agency doctors based their medical opinions on clinical findings independent of the treating physician's findings, their opinions can serve as substantial evidence.  <u>Andrews</u>, 53 F.3d at 1041.

Plaintiff's assertion that the ALJ should have contacted Dr. Felix for clarification on his medical opinion and records is without merit.  An ALJ does have a duty to develop the record.  However, but that duty is only triggered if there is "ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  <u>Mayes v. Massanari</u>, 276 F.3d 453, 460 (9th Cir. 2001)(citing <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001)).  Here, there is no showing that the record was ambiguous or inadequate.

\\

\\

\\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED:  October 30, 2017

_____
/S/

SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER LEGAL DATABASE.**